1   FOLGER LEVIN & KAHN LLP
    Andrew J. Davis (CSB No. 203345, ddavis@flk.com)
2   Embarcadero Center West
    275 Battery Street, 23rd Floor
3   San Francisco, CA 94111
    Telephone: (415) 986-2800
4   Facsimile: (415) 986-2827

5   Attorneys for Defendant
    LANDMARC CAPITAL & INVESTMENT CO.
6

7

8               UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11              SAN FRANCISCO DIVISION

12  GABRIELA TATRANSKA and              Case No. CV-08-3450 SI
    DRAHOTIN TATRANSKY,
13
              Plaintiffs,
14                                      **DEFENDANT LANDMARC CAPITAL &**
        v.                              **INVESTMENT CO.'S MOTION TO**
15                                      **DISMISS COMPLAINT UNDER FED. R.**
    LANDMARC CAPITAL &                  **CIV. PROC. 12(b)(2) AND 12(b)(6)**
16  INVESTMENT CO., STEVEN
    DAGGETT, FIDELITY NATIONAL
17  TITLE INSURANCE COMPANY,            Date: October 10, 2008
    DOES 1 THROUGH 25, INCLUSIVE,       Time: 9:00 a.m.
18                                      Judge: Hon. Susan Illston
              Defendants.              Courtroom: 10
19

20                                      Complaint filed in State Court: June 6, 2008

21

22

23

24

25

26

27

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

I.    FACTUAL BACKGROUND ........................................................................... 2

II.   ARGUMENT .................................................................................................. 3

      A.    THIS COURT DOES NOT HAVE PERSONAL
          JURISDICTION OVER LANDMARC CAPITAL ......................... 3

          1.    California Courts do not Have General Jurisdiction
              over Landmarc Capital ............................................................. 4

          2.    This Court Does Not Have Specific Jurisdiction Over
              Landmarc Capital .................................................................... 5

              a.    Landmarc Capital Did Not Purposefully Avail
                   Itself of California Law ................................................. 6

              b.    The Tatranskas' Claims Do Not Arise Out of or
                   Relate to Landmarc Capital's Activities in
                   California ......................................................................... 7

              c.    California's Exercise of Personal Jurisdiction
                   over Landmarc Capital would be Unreasonable .......... 8

                  (1)    Landmarc Capital Did Not Purposefully
                        Avail Itself of California Law ........................... 9

                  (2)    It is a Substantial Burden to Force
                        Landmarc Capital to Litigate in
                        California ............................................................. 10

                  (3)    Arizona Has a Strong Interest in
                        Adjudicating the Dispute and Would Be
                        the Most Convenient Venue for This
                        Dispute ................................................................. 10

                  (4)    The Most Efficient Resolution Would Be
                        in Arizona ........................................................... 11

                  (5)    Convenient and Effective Relief for
                        Plaintiff ............................................................... 11

                  (6)    Availability of an Alternate Forum ................. 11

      B.    THE TATRANSKAS HAVE FAILED TO STATE A CLAIM
          AGAINST LANDMARC CAPITAL .............................................. 12

          1.    The Tatranskas' Rescission Claim is Barred as a Matter
               of Law ..................................................................................... 12

          2.    The Tatranskas' Claims for Civil Damages are Barred
               by the Statute of Limitations ................................................. 13

III.  CONCLUSION ................................................................................................ 13

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page**

### CASES

*Amini Innovation Corp. v. JS Imports, Inc.*,
497 F.Supp.2s 1093 (C.D. Cal. 2007) ................................................. 6

*Antanuos v. First Nat'l Bank of Ariz.*,
508 F.Supp.2d 466 (E.D. Va. 2007) ................................................. 13

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*,
223 F.3d 1082 (9th Cir. 2000) ................................................. 4

*Barry v. Mtg. Serv. Acquisition Corp.*,
909 F.Supp. 65 (Dist. R.I. 1995) ................................................. 4

*Brand v. Menlove Dodge*,
796 F.2d 1070 (9th Cir. 1986) ................................................. 9

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ................................................. 5

*F.D.I.C. v. British-Amer. Ins. Co., Ltd.*,
828 F.2d 1439 (9th Cir. 1987) ................................................. 3, 5, 8, 9

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
284 F.3d 1114 (9th Cir. 2002) ................................................. 3, 5

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
466 U.S. 408 S.Ct. 413 (1952) ................................................. 4

*Henderson v. GMAC Mtg. Corp.*,
2008 WL 1733265 at *7 (D. Wash. 2008) ................................................. 13

*Huber v. Dave Pratt Enter.*,
LLC, 2007 WL 2156084 at * 4 ................................................. 9

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ................................................. 3, 5

*Jordan v. Colorado Nat'l Bank*,
1995 WL761231 at * 3 (N.D. Cal. 1995) ................................................. 4, 6, 7, 8

*Kulko v. California Superior Court*,
436 U.S. 84 (1978) ................................................. 5

*Monaco v. Bear Sterns Residential Mtg. Corp.*,
2008 WL 867727 (C.D. Cal. 2008) ................................................. 13

*Panavision Int'l, L.P. v. Toeppen*,
141 F.3d 1316 (9th Cir. 1998) ................................................. 11

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ................................................. 3

*Warfield v. Gardner*,
346 F.Supp.2d 1033 (D. Ariz. 2004) ................................................. 3

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

1

## TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

4

### STATUTES

5

Home Ownership and Equity Protection Act ("HOEPA"),
   15 U.S.C. §§ 1602(aa) and 1639 ........................................................................1, 12, 13

6

Truth In Lending Act ("TILA"),
   15 U.S.C. § 1601 ..............................................................................................1, 12, 13

7

Fed. R. Civ. P. 12(b)(2)..........................................................................................................1

8

Fed.R.Civ.P. 12(b)(6)......................................................................................................1, 12

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Folger Levin &
Kahn llp
Attorneys At Law

1      Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), Defendant

2    Landmarc Capital & Investment Co. ("Landmarc Capital") hereby gives notice that on

3    October 10, 2008, at 9:00 a.m., a hearing will be held in Courtroom 10 of this Court at

4    450 Golden Gate Avenue in San Francisco, California, 94102, on Landmarc Capital's

5    motion to dismiss the Complaint filed by Plaintiffs Gabriela Tatranska and Drahotin

6    Tatransky (collectively, "Plaintiffs" or "the Tatranskas") in this action.  This motion will

7    be based on this notice of motion and memorandum of points and authorities, the

8    Affidavit of Malecia Jewell filed concurrently herewith, the Court's file on this matter,

9    and such other evidence and argument as may be presented at the hearing.

10      Pursuant to Fed. R. Civ. P. 12(b)(2), Landmarc Capital respectfully moves the

11    Court to dismiss this matter because it lacks personal jurisdiction over Landmarc Capital,

12    an Arizona private money lender that made a short term loan to the Tatranskas.  That the

13    loan was secured by Plaintiffs' eight Arizona investment properties, which will soon be

14    the subject of foreclosure proceedings in Arizona, highlights the Court's lack of

15    jurisdiction over Landmarc Capital.  Alternatively, this matter should be dismissed

16    pursuant to Fed.R.Civ.P. 12(b)(6), because the Tatranskas' claims under the Truth In

17    Lending Act ("TILA"), 15 U.S.C. § 1601, *et. seq.*, and the Home Ownership and Equity

18    Protection Act ("HOEPA"), 15 U.S.C. §§ 1602(aa) and 1639, fail as a matter of law.[1]

19    Specifically, the Tatranskas have asked for two forms of relief: (1) rescission of the loan

20    under 15 U.S.C. § 1635; and (2) monetary damages under 15 U.S.C. § 1640.  The

21    Tatranskas' rescission claim fails as a matter of law because on its face 15 U.S.C. § 1635

22    applies only when the property securing the loan is the consumer's primary residence,

23    which, based on the Tatranskas' Complaint, is not the case here.  Similarly, the

24    Tatranskas' claim for monetary damages under 15 U.S.C. §1640 fails because it was filed

25    outside the one-year statute of limitations provided by TILA.  Accordingly, if this Court

26

27    [1] HOEPA is an amendment to TILA that offers further protections for high rate
mortgages. The remedy for a HOEPA violation are governed by TILA's remedial
28    provisions.

1  determines that it has jurisdiction over Landmarc Capital, this matter still should be

2  dismissed in its entirety because the Tatranskas have failed to state a claim for relief under

3  Rule 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    FACTUAL BACKGROUND.

Landmarc Capital is an Arizona corporation, with its principal and exclusive place of business in Scottsdale, Arizona. (*See* Affidavit of Malecia Jewell at ¶ 3.) Landmarc Capital provides loans to individuals that are secured by Arizona real property. (*Id.* at ¶ 4.) Landmarc Capital is licensed exclusively in Arizona. (*Id.* at ¶ 5.)

On May 9, 2007, Plaintiffs contacted Landmarc Capital in Arizona to obtain a loan in the amount of $770,000 (the "Loan"), that was to be secured by *eight* Arizona investment properties (the "Arizona Investment Properties") owned by the Tatranskas. (*Id.* at ¶ 7.) At no point did any Landmarc Capital employee or agent travel to California to meet with Plaintiffs. (*Id.* at ¶ 8.) Instead, all contact and communication between Landmarc Capital and the Tatranskas was done via telephone, facsimile or mail. (*Id.* at ¶ 9.)

Based on Plaintiffs' credit and the equity the Tatranskas had amassed on each of the Arizona Investment Properties, Landmarc Capital agreed to fund the Loan. (*Id.* at ¶ 10.) To make sure that the Loan was secured, Plaintiffs consented to Landmarc Capital recording with the Maricopa County Recorder's Office a second position deed of trust on each of the Arizona Investment Properties. (*Id.* at ¶ 14.)

Pursuant to its terms, the Loan was an interest only loan, governed by Arizona law, which matured on June 1, 2008. (*See* Deed of Trust Attached to Complaint.)[2] During the term of the Loan, Plaintiffs agreed to make monthly interest-only payments to Landmarc Capital in Arizona. (Jewell Aff. at ¶16.) When the Loan matured, on June 1, 2008,

_____

[2] A copy of the Complaint is attached hereto as Exhibit 1.

-2-

1   Plaintiffs were required to repay the principal amount. (*Id.* at ¶ 17.) However, Plaintiffs

2   failed to do so, and, accordingly, Landmarc Capital intends to begin foreclosure

3   proceedings on each of the deeds of trust recorded on the Arizona Investment Properties

4   in the near future. (*Id.* at ¶ 18-19.)

5

6   **II.    ARGUMENT**

7        **A.    THIS COURT DOES NOT HAVE PERSONAL JURISDICTION**
           **OVER LANDMARC CAPITAL.**

8

9        Landmarc Capital is an Arizona entity that did nothing more than provide a loan to

10  the Tatranskas that was payable in Arizona and secured by Arizona real property. (*Id.* at

11  ¶¶3, 14.) Significantly, Landmarc Capital never sent a representative to California to

12  meet with the Tatranskas, and does not systematically engage in business in the state of

13  California. (*Id.* at ¶5, 8.) As such, this Court lacks personal jurisdiction over Landmarc

14  Capital.

15       On a motion to dismiss the Tatranskas bear the burden of demonstrating that this

16  Court has jurisdiction over Landmarc Capital. *Schwarzenegger v. Fred Martin Motor*

17  *Co.*, 374 F.3d 797, 801 (9th Cir. 2004). Courts may exercise either general or specific

18  jurisdiction over nonresident defendants. *F.D.I.C. v. British-Amer. Ins. Co., Ltd.*, 828

19  F.2d 1439, 1442 (9th Cir. 1987). General jurisdiction exists when the nonresident has

20  "substantial" or "continuous and systematic" contacts with the forum state. *Id.* (citing

21  *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). In California, specific

22  jurisdiction exists when the nonresident has "at least 'minimum contacts' with the relevant

23  forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play

24  and substantial justice.'" *Warfield v. Gardner*, 346 F.Supp.2d 1033, 1038 (D. Ariz. 2004)

25  (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)); *see also, Glencore*

26  *Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir.

27  2002).[3] Given Landmarc Capital's limited and attenuated contact with California, and the

28  _____
[3] That Plaintiffs' claims against Landmarc arise under federal statutory schemes does not,

1    facts detailed above regarding the origination of the Loan, Plaintiffs cannot satisfy either

2    standard.

3

4        **1.    California Courts do not Have General Jurisdiction over
             Landmarc Capital.**

5

6        Landmarc Capital does not maintain systematic contacts or sufficient business to

7    warrant general jurisdiction in California.  For general jurisdiction to exist, "the defendant

8    must engage in 'continuous and systematic general business contacts.'"  *Id.* (citing

9    *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 413

10   (1952)).  Factors to be considered include: "whether the defendant makes sales, solicits or

11   engages in business in the state, serves the state's markets, designates an agent for service

12   of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. Augusta*

13   *Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000); *see also Jordan v. Colorado Nat'l Bank*,

14   1995 WL761231 at * 3 (N.D. Cal. 1995).  In *Jordan*, the court held that it did not have

15   general jurisdiction over a Colorado bank because the bank had no offices in California,

16   did not advertise in California, did not seek to attract California customers and was not

17   qualified to do business in California. *Jordan*, 1995 WL 761231 at *3.  Similarly, none of

18   these factors exist here.  Landmarc Capital has no offices in California, does not hold any

19   California licenses, is not incorporated in California, and is not registered to do business

20   in California.  (*See* Jewell Aff. at ¶¶ 3,5,6.)

21       In *Bancroft*, a California corporation argued that California had general jurisdiction

22   over Augusta National, a Georgia corporation, merely because it had a license agreement

23   with two television networks and "a handful of California vendors." *Id.*  The Court

24   characterized Augusta National's limited interaction with California as "doing business

25   in and of itself, provide personal jurisdiction over Landmarc. *See Barry v. Mtg. Serv.*
     *Acquisition Corp.*, 909 F.Supp. 65, 72 (Dist. R.I. 1995) (holding that "[i]f the federal

26   statute does not provide for nationwide service, then personal jurisdiction is governed by
     the forum state's long-arm statute.")  The Truth In Lending Act ("TILA") does not

27   provide for nationwide service; therefore whether the Court has jurisdiction is governed
     by the contours of due process. *Id.*

28

1    with California, but...not doing business *in* California." *Id.* (emphasis added). The same

2    distinction can be made here; Landmarc Capital might occasionally do business with

3    California residents who own Arizona property, such as the Tatranskas, but it does not

4    engage in anywhere near the type of systematic and continuous business relationships that

5    are necessary to support the Court's exercise of general jurisdiction.

6

7    **2.      This Court Does Not Have Specific Jurisdiction Over Landmarc Capital.**

8

9    Similarly, Landmarc Capital's limited interaction with the Tatranskas regarding

10   their Arizona Investment Properties is not sufficient to establish specific jurisdiction. In

11   order to establish specific jurisdiction over Landmarc Capital the Tatranskas must show

12   that California's long-arm statute confers personal jurisdiction over Landmarc Capital and

13   that the exercise of jurisdiction accords with federal constitutional principles of due

14   process. *Glencore Grain Rotterdam B.V.,* 284 F.3d at 1123; *F.D.I.C. v. British-Amer. Ins.*

15   *Co., Ltd.,* 828 F.2d 1439, 1441 (9th Cir. 1987). Because California's long-arm statute

16   extends jurisdiction to the extent permitted by due process, for specific jurisdiction to

17   exist over Landmarc Capital, the Tatranskas must demonstrate that Landmarc Capital has

18   "minimum contacts" with California such that the exercise of jurisdiction "does not offend

19   traditional notions of fair play and substantial justice." *Id.* at 1441-42 (citing *Int'l Shoe*

20   *Co. v. Washington,* 326 U.S. 310, 316 (1945)). In reaching this determination, the Court

21   must reject mechanical determinations and instead be mindful that "'the facts of each case

22   must [always] be weighed' in determining whether personal jurisdiction would comport

23   with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462,

24   485-86 (1985) (citing *Kulko v. California Superior Court,* 436 U.S. 84, 92 (1978)).

25   In determining whether the requisite "minimum contacts" exist for purposes of

26   specific jurisdiction, courts employ a three-part test:

27            (1)    the non-resident defendant must purposefully direct his
                     activities or consummate some transaction with the
28                   forum or resident thereof; or perform some act by
                     which he purposefully avails himself of the privilege of

conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3)    the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.

Given that Landmarc Capital did not direct its activities towards California or conduct business in California in regard to this matter, and is, to the contrary, an Arizona company that does business almost exclusively in Arizona, it is not surprising that Plaintiffs cannot satisfy any of the three prongs required to confer specific jurisdiction.

### a.    Landmarc Capital Did Not Purposefully Avail Itself of California Law.

Under the first prong of the three-part specific jurisdiction test, the plaintiff must show that the defendant "purposefully availed itself of the privilege of conducting activities in California or purposefully directed its activities towards California." *Id.* The "purposeful availment" test is used when the action arises out of contract while the "purposeful direction" analysis is used when the action sounds in tort. *Id.* As the Tatranskas' claims arise out of contract, the purposeful availment analysis is the proper measure to determine whether Landmarc Capital is subject to the personal jurisdiction of California.

"The purposeful availment requirement is met if the defendant performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Jordan v. Colorado Nat'l Bank*, 1995 WL761231 at * 3 (N.D. Cal. 1995). Entering into a contract with a forum resident "is not sufficient, standing alone, to establish purposeful availment." *Amini Innovation Corp. v. JS Imports, Inc.*, 497 F.Supp.2s 1093, 1105 (C.D. Cal. 2007), citing *Burger King,* 471 U.S. at 478, 105 S.Ct. 2174; *Gray,* 913 F.2d at 760. In *Amini*, the Court held that maintaining and using a

1    website that offered products to California residents was insufficient to satisfy the

2    purposeful availment standard.  *Id.*  In *Jordan*, a California resident brought an action

3    against a Colorado bank in California arising out of a series of relationships between the

4    parties over a fifteen year period.  *Jordan*, 1995 WL 761231 at *3-4.  The court found that

5    the defendant had purposefully availed itself of California laws because the Bank accepted

6    California property as collateral for loans made to the plaintiff and invested the plaintiff's

7    assets in a retail building in California.  *Id.*

8        There are no similar circumstances present here.  Landmarc Capital did not accept

9    any of the Tatranskas' California property as collateral for the Loan and in no other way

10   availed itself of the advantages of transacting business in California.  Although the

11   Tatranskas executed the loan documents in California, the documents were prepared and

12   executed in Arizona by Landmarc Capital prior to being sent to California for execution

13   by the Tatranskas.  (*See* Jewell Aff. at ¶11.)  Further, Landmarc Capital funded the Loan

14   based solely on the equity the Tatranskas had in their Arizona Investment Properties. (*Id.*

15   at ¶10.)  The security for the Loan was Arizona residential real estate and Landmarc

16   Capital had no indication or expectation as to how the Tatranskas would use the loan

17   proceeds such that jurisdiction could be conferred.  (*Id.* at ¶13.)  Simply put, Landmarc

18   Capital did not purposefully avail itself of California law in any material way; to force

19   Landmarc Capital to litigate the Tatranskas' baseless claims in California would be

20   unreasonable.

21                    **b.    The Tatranskas' Claims Do Not Arise Out of or Relate to
                             Landmarc Capital's Activities in California.**

22

23       The second prong of the three-part test for "minimum contacts" requires that "the

24   claim must be one which arises out of or relates to the defendant's forum-related

25   activities." *Jordan*, 1995 WL 761231 at *4.  The Ninth Circuit applies a "but for" test to

26   determine whether a particular claim arises out of forum-related activities and thereby

27   satisfies the second requirement for specific jurisdiction.  *Id.*  Under this test, the "arising

28   out of" prong is not satisfied where the claims would exist even if there had been no

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

LANDMARC CAPITAL & INVESTMENT CO.'S MOTION
TO DISMISS COMPLAINT; CASE NO. CV-08-3450 SI

1  contacts whatsoever with the forum. *Id.* Here, plaintiffs purported claims would exist

2  even if there had been no connection whatsoever with California. Assuming the

3  allegations of the Tatranskas' complaint are true, the loan documents that purportedly

4  violated the TILA and HOEPA statutes were prepared and executed by Landmarc Capital

5  in Arizona and the entire transaction was structured around the Tatranskas' extensive

6  Arizona real property holdings. The only contacts that Landmarc Capital had with

7  California were mailing the documents to a California title company for execution by the

8  Tatranskas and talking to the Tatranskas via telephone to fill out their loan application.

9  (*See* Jewell Aff. at ¶9, 11.) Thus, the Tatranskas' purported claims against Landmarc

10  Capital would have arisen regardless of where the documents were signed or where the

11  Tatranskas were when they gave Landmarc Capital the information to complete their loan

12  application. In contrast, the Court in *Jordan* heavily relied on the Colorado bank's use of

13  the plaintiff's California property as collateral and its act of investing the plaintiff's assets

14  in a California property to find that the second, "arising out of" prong had been satisfied.

15  *Id.* Given the absence of any such evidence in this case, the Tatranskas' claims do not

16  arise out of or in any way relate to Landmarc Capital's activities in California.

17

18            c.    **California's Exercise of Personal Jurisdiction over**
                    **Landmarc Capital would be Unreasonable.**

19

20            The third prong of the specific jurisdiction test requires the Court to consider the

21  following seven factors to determine whether the exercise of specific jurisdiction over a

22  defendant is reasonable: (1) the extent of the defendant's purposeful interjection into the

23  forum state; (2) the burden on the defendant of litigating in the forum; (3) the extent of

24  conflict with sovereignty of the defendant's state; (4) the forum state's interest in

25  adjudicating the dispute; (5) the most efficient judicial resolution of the dispute; (6) the

26  importance of the forum to the plaintiff's interest in convenient and effective relief; and

27  (7) the existence of an alternative forum. *F.D.I.C. v. British-Amer. Ins. Co.*, 828 F.2d

28  1439, 1442 (9th Cir. 1987).

1

2          **(1)    Landmarc Capital Did Not Purposefully Avail Itself
                     of California Law.**

3

4          Under this prong, the plaintiff must prove that the defendant committed some

5   intentional act to purposefully avail himself of the laws of the forum state, and that the

6   defendant has not been hailed into a foreign jurisdiction "as the result of random,

7   fortuitous, or attenuated contacts." *Brand v. Menlove Dodge*, 796 F.2d 1070 (9th Cir.

8   1986). Courts have repeatedly held that the mere fact that a foreign defendant entered into

9   a contract with an in-state resident does not give rise to specific jurisdiction. *See, e.g.,*

10  *F.D.I.C. v. British-Amer. Ins. Co., Ltd.*, 828 F.2d 1439; *Huber v. Dave Pratt Enter., LLC*,

11  2007 WL 2156084 at * 4.

12         In *F.D.I.C. v. British-American Insurance Co.* ("BAIC"), the FDIC attempted to

13  file a claim against BAIC, a Bahaman company, in California on the basis of a contract

14  that was signed between BAIC and an insolvent California Bank that subsequently wound

15  up under the control of the FDIC. *British-Amer. Ins.*, 828 F.2d at 1440. The Court held

16  that BAIC had not purposefully availed itself of California law, and as a result the court

17  did not have personal jurisdiction over BAIC, based on the following facts: (1) the

18  contract was expressly governed by Fiji law; (2) the insolvent bank solicited the contract

19  with BAIC; and (3) the negotiations were conducted in Malaysia. *Id.* at 1442. Similarly, in

20  this case, the Loan is governed by Arizona Law, the Tatranskas solicited the loan from

21  Landmarc Capital, no Landmarc Capital employee went to California to negotiate the

22  Loan and the negotiations for the Loan were conducted entirely via telephone. (*See*

23  Exhibit B to Complaint at ¶12; Jewell Aff. at ¶¶8,9.) Further, the collateral is located in

24  Arizona.)

25         The *BAIC* court went on to hold that the mere fact that a BAIC employee traveled

26  to California to deliver the contract was insufficient to support jurisdiction, and the fact

27  that the insolvent bank was located in California and that the payments came from a

28  California bank was "fortuitous, not purposeful." *British-Amer. Ins.*, 828 F.2d at 1442.

1   Here, no Landmarc Capital employee went to California to discuss or execute the loan

2   documents; rather, all loan documents were signed in Arizona and then sent to California

3   for execution by the Tatranskas. (Jewell Aff. at ¶¶8,11.) That the Tatranskas were

4   California residents, signed the loan documents in California and sent payments to

5   Landmarc Capital from their California bank is merely fortuitous and does not give rise to

6   personal jurisdiction over Landmarc Capital, as the transaction at issue in this litigation in

7   no way related to the Tatranskas' activities in California, but solely related to their

8   property holdings in Arizona.

9

10                   **(2)    It is a Substantial Burden to Force Landmarc**
                             **Capital to Litigate in California.**

11

12      Although the burdens of litigating in a foreign jurisdiction have become less

13   significant with technological advances, where the defendant has "done little to reach out

14   to the forum state" the burden of defending an action in the foreign jurisdiction should not

15   be imposed on the defendant. *British-Amer. Ins.*, 828 F.2d at 1444. Here, Landmarc

16   Capital did not reach out to California or the Tatranskas in any way. The Tatranskas

17   sought out a loan from Landmarc Capital in Arizona. (Jewell Aff. at ¶¶7.) To force it to

18   litigate in the Tatranskas' home jurisdiction on a note secured by Arizona property and

19   governed by Arizona law would be a substantial burden.

20

21                   **(3)    Arizona Has a Strong Interest in Adjudicating the**
                             **Dispute and Would Be the Most Convenient Venue**

22                          **for This Dispute.**

23      Arizona has a strong interest in adjudicating the interests in property located within

24   its territory. The collateral for the Loan, which necessarily will be a factor in this

25   litigation, is wholly located within Arizona and the parties expressly agreed that Arizona

26   law applies. Although the Tatranskas are California residents, the matter at the heart of

27   this controversy is the Tatranskas' property in Arizona. Arizona has the greatest interest in

28

1  this dispute and the case should be tried within its borders.

2

3          **(4)    The Most Efficient Resolution Would Be in Arizona.**

4          In determining the most efficient forum, courts look at the governing law and

5  where would be the most convenient forum for witnesses or records. *See British-Amer.*

6  *Ins.*, 828 F.2d at 1444.  Here, the contract is governed by Arizona law, Landmarc

7  Capital's witnesses and evidence are located in Arizona, and the properties that are

8  collateral for the Tatranskas' obligations are in Arizona.  Further, as Landmarc Capital has

9  begun foreclosure proceedings on the Arizona Investment Properties, it would be a more

10 efficient allocation of judicial resources to consolidate the action with the Tatranskas'

11 claims, should they survive, in one proceeding in Arizona.

12

13         **(5)    Convenient and Effective Relief for Plaintiff.**

14         In the Ninth Circuit, the plaintiff's convenience is given little weight. *See*

15 *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998).  Arizona cannot

16 be considered an inconvenient forum for the Tatranskas because on their own volition

17 they purchased and maintained eight rental properties within Arizona, subjecting

18 themselves to the jurisdiction of Arizona law.

19

20         **(6)    Availability of an Alternate Forum.**

21         Arizona is an available and more convenient forum.  The Loan is governed by

22 Arizona law and the property securing the loan is governed by Arizona law.  Any relief

23 granted by this Court would necessarily end up going through Arizona courts.

24         Taking into account all of the foregoing factors, Arizona is the most convenient,

25 effective and reasonable forum for all parties.  Collectively, the salient factors weigh

26 strongly in favor of this Court's denial of personal jurisdiction over Landmarc Capital.

27         In sum, Plaintiffs cannot meet their burden in regard to this Court's exercise of

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-11-

1   specific jurisdiction over Landmarc Capital.  Consequently, as neither general nor specific

2   jurisdiction applies, the exercise of jurisdiction over Landmarc Capital would run afoul of

3   the due process clause of the Constitution.  Accordingly, this matter should be dismissed.

### B.    THE TATRANSKAS HAVE FAILED TO STATE A CLAIM AGAINST LANDMARC CAPITAL.

7        Even if the Tatranskas could establish jurisdiction over Landmarc Capital (which

8   they cannot), the claims set forth in the Complaint should still be dismissed for failure to

9   state a claim. Fed. R. Civ. Proc. 12(b)(6).  The Tatranskas have asserted claims under both

10  TILA and HOEPA, statutory schemes designed to protect the extension of credit to

11  consumers in regard to their personal residences.[4]  Specifically, the Tatranskas have

12  demanded relief under 15 U.S.C. § 1635 in the form of rescission of the Loan, and

13  monetary damages under 15 U.S.C. § 1640.  The Tatranskas allege that the Loan was a

14  "consumer" loan under TILA and HOEPA.  Although Landmarc Capital disagrees with

15  this contention, even accepting the Tatranskas' allegations as true they still fail to state a

16  claim under TILA or HOEPA for two reasons: (1) the Tatranskas' claim for rescission is

17  barred because 15 U.S.C. § 1635 applies only when the security for a loan is the

18  borrower's "principal residence;" and (2) the Tatranskas' claim for civil damages is barred

19  under TILA's one-year statute of limitations.

### 1.    The Tatranskas' Rescission Claim is Barred as a Matter of Law.

22       Because the Tatranskas secured the Loan with the Arizona Investment Properties,

23  they are ineligible for rescission under TILA.  The right of rescission provided under

24  TILA and HOEPA applies only when the security interest is the "principal dwelling of the

25  person to whom credit is extended." 15 U.S.C. § 1635; *see also Antanuos v. First Nat'l*

---

[4] HOEPA is an amendment to TILA and its remedies are the same as those provided by TILA.

28

1    *Bank of Ariz.*, 508 F.Supp.2d 466, 470 (E.D. Va. 2007) (holding that even where the

2    lender erroneously gave the borrower right of rescission documents, the borrower could

3    not assert rescission claim because the property securing the debt was not the borrower's

4    primary residence.). The Tatranskas alleged in their Complaint that the collateral for the

5    Loan consisted of "investment properties." *See* Complaint at ¶ 8. As a matter of law the

6    Tatranskas' claim for rescission is barred.[5]

7

8              2.      **The Tatranskas' Claims for Civil Damages are Barred by the
                       Statute of Limitations.**

9

10            The Tatranskas closed the Loan on May 18, 2007, but did not file the present

11   action until June 6, 2008, as such, their claim is barred by TILA's one-year statute of

12   limitations. TILA and HOEPA provide that any claim for monetary damages must be

13   brought "within one year from the date of occurrence of the violation." 15 U.S.C. §

14   1640(e); *see also Monaco v. Bear Stearns Residential Mtg. Corp.*, 2008 WL 867727 (C.D.

15   Cal. 2008). Ninth Circuit courts have interpreted the above provision to mean within one

16   year from "the date of consummation of the transaction." *Monaco*, 2008 WL 867727 at

17   *3. "Consummation means the time that a consumer becomes contractually obligated on

18   a credit transaction." *Id.* Here, the Loan was consummated on May 18, 2007. *See* Note

19   attached to Complaint. The Tatranskas did not file the present action until June 6, 2008.

20   *See* Complaint. Accordingly, the Tatranskas' claim for civil damages is time barred.

21

22   **III.    CONCLUSION.**

23            Based on the foregoing, Defendant Landmarc Capital respectfully requests that the

24   _____

25   [5] Even if the Tatranskas' rescission claim were not barred under TILA, they would be
     required to tender the total amount of the mortgage principal plus interest, which they
26   have not done. *See Henderson v. GMAC Mtg. Corp.*, 2008 WL 1733265 at *7 (D. Wash.
     2008) (holding that rescission claim failed because borrower had failed to repay or even
27   demonstrate any ability to repay the loan.) To date, the Tatranskas have failed to tender
     any money or even provide any evidence they have the capability to do so and
28   accordingly their claim for rescission must fail. *See* Jewell Aff. at ¶ 8.

1  Court dismiss this action for lack of personal jurisdiction, or, in the alternative if the Court

2  finds it has personal jurisdiction over Landmarc Capital, to dismiss the action for failure

3  to state a claim.

4

5  Dated: July 24, 2008                           FOLGER LEVIN & KAHN LLP

6

7                                                      Andrew J. Davis
                                                    Attorneys for Defendant

8                                        LANDMARC CAPITAL & INVESTMENT CO.

9

10

11     57510\2001\611006.1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Glenn L. Moss (State Bar No. 44307)
Ann Murphy (State Bar No. 66947)
MOSS and MURPHY
1297 B Street
Hayward, Califronia 94541

Tel: (510) 583-1155
Fax: (510) 583 1299

Attorneys for Plaintiffs,
Gabriela Tatranska and
Drahotin Tatransky

ENDORSED
F I L E D
ALAMEDA COUNTY

JUN 0 6 2008

CLERK OF THE SUPERIOR COURT
By Cecilia Anchundo, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

HAYWARD BRANCH - UNLIMITED JURISDICTION

GABRIELA TATRANSKA and
DRAHOTIN TATRANSKY,

            Plaintiffs,

vs.

LANDMARC CAPITAL & INVESTMENT
CO., STEVEN DAGGETT, FIDELITY
NATIONAL TITLE INSURANCE
COMPANY, DOES 1 THROUGH 25,
INCLUSIVE,

            Defendants.
_____/

No.

HG08391422

COMPLAINT FOR RESCISSION
OTHER EQUITABLE RELIEF
AND DAMAGES

I

GENERAL ALLEGATIONS

[All Causes of Action]

1.  Plaintiffs are from Eastern Europe.  English
is the third and fourth language of plaintiffs.

2.  Defendant, Landmarc Capital & Investment Co.
[Landmarc], is a corporation regularly engaged in the
business of loaning money payable by written agreement in

-1-

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B Street
HAYWARD, CALIFORNIA 94541
(510) 583-1155

more then four installments for which a finance charge is imposed to consumers, such as plaintiffs. This corporation is headquartered in Arizona and does business in California. Plaintiffs are uncertain of the place of incorporation of this defendant.

3. Defendant, Steven Daggett [Steven], is licensed by the State of California Department of Real Estate as a salesperson. Plaintiffs are uncertain of the licensed real estate broker, who employed Steven. This broker is designated as Doe 1 and the company that employs the broker is designated as Doe 2.

4. Plaintiffs do not know the true names and capacities, whether corporate, associate, or individual, of defendants sued herein as DOE 1 through DOE 25 and, for that reason, have sued said defendants by such fictitious names, and plaintiffs pray leave to insert the true names and capacities of said defendants when the same are ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the defendants designated herein as a DOE is negligently or otherwise responsible in some manner for the events and happenings referred to and by such negligence or other fault, has proximately caused the wrongful injuries of the plaintiffs as herein alleged.

5. This Court has unlimited jurisdiction over the persons and subject matter since the amount in controversy exceeds $25,000.00. The loans, which are the subject of this lawsuit, were made in California for the

-2-

ROSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

purpose of allowing plaintiffs to finish construction of their principal residence. Said home is located in Hayward, California. Moreover, the loan contract and other documents were negotiated within the jurisdiction of this Court.

6. In April, 2007 plaintiffs were building a new home in Hayward which they intended to occupy as their principal residence. They needed to borrow at least $771,000.00 and spoke with Steven about securing these needed funds. Steven represented to plaintiffs that he was a licensed mortgage broker and that the best loan for which plaintiffs would qualify, was from Landmarc. Plaintiffs relied on Steven and signed the required loan documents at the home of the contractor. Before the loan closed, plaintiffs received no copies of any of the loan documents. In particular, they did NOT receive the documents required by the Truth in Lending Act [15 USC §1601 et seq, hereinafter TILA] and by the Home Ownership and Equity Protection Act of 1994, 15 USC §1602(aa) and 1639, hereinafter HOEPA].

7. Prior to securing the loan from Landmarc, Steven knew that the purpose of this loan was to allow plaintiffs to complete construction of a home that would be the principal residence of plaintiffs.

8. Prior to making the loan which is the subject of this lawsuit, Landmarc also knew this was a consumer loan, which would be used to allow plaintiffs to finish the construction of a home that would be used as the

-3-

MOSS & MURPHY
ATTORNEYS AT LAW
1237 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

principal residence of plaintiffs. Landmarc and the other defendants conspired to deprive plaintiffs of the protections of TILA and HOEPA to which they were entitled. In particular, defendants sought security interests in plaintiffs' investment properties instead of their principal residence or the new principal residence which was the purpose of this loan.

9. As a condition precedent to making the loan of $771,000.00, Landmarc insisted that plaintiffs pay off the existing loans on investment properties that were being pledged as security. The loan was made on May 21, 2007. The funds were distributed as provided in the Closing Instructions prepared by First American Title, which are attached as Exhibit A, together with the additional demands of Steven which are also included as part of Exhibit A.

10. Plaintiffs have not received a complete copy of the Note. The portions of the Note which they received are attached as Exhibit B.

11. The Deed of Trust recorded to secure the Note is attached as Exhibit C. The eight properties of plaintiffs, which were pledged as security pursuant to this Deed of Trust, are included as part of Exhibit C. Each Deed of Trust identifies Fidelity National Title Insurance Company as the Trustee. Fidelity National Title Insurance Company is named as a defendant only in its capacity as Trustee. As provided in California Civil Code Section 2934(I), no Answer is required of the

-4-

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

Trustee if it agrees to abide by the decisions of this Court, and recognizes the Rescission of the Note and Deed of Trust as provided in this lawsuit. This Trustee must cooperate with the Court Orders requiring reconveyance of the Deed of Trust, so that plaintiffs may pay off the loan and secure new financing as required by TILA and HOEPA.

FIRST CAUSE OF ACTION

[Rescission of Transaction Pursuant to TILA and HOEPA: Against All Defendants]

12.    Plaintiffs incorporate all the allegations in paragraphs 1 through 11 as if set forth in full.

13.    The above mentioned consumer credit transaction was a high rate mortgage within the meaning of HOEPA, 15 USC §1602(aa)(1)(B), in that the total points and fees as defined in that section that Landmarc charged plaintiffs exceeded 8 percent of the total loan amount. Moreover, the annual percentage rate at consummation of the transaction exceeded by more than 8 percentage points, the yield on Treasury securities having comparable periods of maturity on the 15th of the month immediately preceding the month in which Landmarc received the credit application of plaintiffs.

14.    Contrary to the provisions of 15 USC §1639(e) and Regulation Z §226.32(d)(1), the instant one year obligation contained a balloon payment. This balloon payment was equal to the entire principal amount, $771,000.00. This balloon payment was due by June 2008.

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

-5-

15.   Contrary to the provisions of 15 USC §1639(d) and Regulation Z §226.32(d)(4), the instant loan contained a prohibited interest rate provision. In particular, the stated interest rate in the note, 15% per annum, increased to 30% per annum in the event of a default on a monthly payment.

16.   Neither Landmarc, Steven nor anyone else provided plaintiffs the disclosure statements required by TILA and HOEPA.

17.   Because of the violations of HOEPA and TILA listed in paragraphs 1 through 16, inclusive, plaintiffs retained the right to rescind the transaction up to three years after its consummation on May 21, 2007. By this Complaint, plaintiffs hereby exercise this right of rescission. Plaintiffs tender to defendants the full amount due as provided by law. The amount due is the amount financed less all loan charges and costs associated with the loan and all payments made to date. Plaintiffs will promptly pay the net balance due as provided herein and upon the reconveyance of the security interests recorded as part of this transaction. In this connection plaintiffs wish to call to your attention the provisions of 15 USC §1635, Regulation Z §226.23. Pursuant to these provisions, the security interest is VOID upon receipt of this Complaint advising you that plaintiffs have exercised their right of rescission. Plaintiffs expect that defendants will take all reasonable steps to reconvey the security interests

-6-

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

within 20 days of receipt of this Complaint, thereby avoiding liability for further damages as provided in 15 USC §1635(b).

18.   If these expectations prove erroneous, plaintiffs will seek the assistance of this Court through issuance of a temporary restraining order and preliminary injunction on such terms as the Court deems just and proper.   The purpose of said injunctions will be to prevent the loss of plaintiffs' properties and insure the reconveyance of the security interests pursuant to the rescission provisions of TILA, HOEPA and parallel state laws.

### SECOND CAUSE OF ACTION

[Damage Claim for Violation of TILA and HOEPA:  Against All Defendants]

19.   Plaintiffs incorporate by reference all the allegations in paragraphs 1 through 18, as if set forth in full.

20.   Steven, and Does 1 and 2, are arrangers of credit as that term is defined in HOEPA.   On information and belief, plaintiffs allege that said defendants made two or more mortgages which qualify for coverage under the triggers of HOEPA. As such, these loan brokers are liable to plaintiffs for the statutory and general damages incurred in connection with this transaction.   In addition, Landmarc is responsible for such damages as the actual lender.

21. In addition, plaintiffs are entitled to

-7-

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

recover their attorney fees pursuant to the provisions of
HOEPA and TILA.  Moreover, the attorney fee provisions of
HOEPA and TILA pre-empt any contrary attorney fee
provisions of contract law enforceable under the state
laws of either Arizona or California.

22.  Among the damages to which plaintiffs are
entitled are all the finance charges and fees plaintiffs
paid.  In addition, plaintiffs are entitled to receive
their general damages and the statutory damages as
provided in TILA and HOEPA

### THIRD CAUSE OF ACTION

[Breach of Fiduciary Duties: Only Against Steven and Does
1 and 2]

23.  Plaintiffs incorporate by reference all the
allegations in paragraphs 1 through 22, as if set forth
in full.

24.  At all times relevant, a fiduciary
relationship existed between plaintiffs, Steven and Does
1 and 2.  Said defendants were retained in 2007 to
provide honest advice to plaintiffs regarding their
financial problems.  As plaintiffs' agents, these
defendants were expected to honestly represent the terms
of any new loans, compare the benefits and burdens of the
prospective new loans, and secure for plaintiffs the best
loan for which they were eligible.  Said defendants were
required to clearly and accurately explain the monetary
obligations connected with each loan.  In addition, said
defendants accepted the responsibility to secure the best

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

-8-

possible loan available in the marketplace for plaintiffs and to explain the available options in clear, concise, and accurate language.

25. On information and belief, plaintiffs allege that these fiduciaries failed to seek alternatives to the clearly usurious loan provided by Landmarc. This is especially true since plaintiffs have excellent credit and earnings in excess of $250,000.00 per year. Thus, plaintiffs would easily have qualified for a loan on substantially better terms then those set forth in the Landmarc loan.

26. As a result of the misrepresentations and false information provided and the actions of these fiduciary agents in concealing or obfuscating the facts, plaintiffs may lose their investment properties that served as the collateral for this consumer loan for their principal residence. As licensed professionals, they acted against the interests of their clients and attempted to evade the provisions of TILA, HOEPA and their fiduciary responsibilities. In particular, they hoped by using the investment properties as the collateral instead of the principal residence, that they could deprive plaintiffs of these consumer protections. Such misconduct constitutes a breach of the fiduciary obligations of said defendants as a mortgage broker as summarized in Wyatt v. Union Mortgage Co. (1979) 24 Cal 3d 773, 157 Cal Rptr 392, and California Civil Code §1573(1).

-9-

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

27. In addition to general damages, plaintiffs are entitled to punitive damages in a sum sufficient to discourage Steven, and Doe 1 and Doe 2, from defrauding other persons such as plaintiffs. Also, the actual damages should be trebled as provided by California Civil Code §3345.

### FOURTH CAUSE OF ACTION

[Negligence: Against Steven, Does 1 and Doe 2 Only]

28. Plaintiffs incorporate all the allegations in paragraphs 1 through 27, inclusive, as if set forth in full.

29. Steven, and Doe 1 and Doe 2, negligently failed to seek competitive quotations from other lenders, to analyze the merits of these other loans and to perform their duties in a professional manner. Moreover, said defendants failed to provide an accurate "good faith estimate" of the economic terms of the alternatives reasonably available to plaintiffs. This negligence induced plaintiffs to accept the clearly inferior loan from Landmarc, which these defendants sold to plaintiffs.

30. The negligence of Steven, Doe 1 and Doe 2 was the proximate cause of damages to plaintiffs. These damages include imminent loss of their investment properties, emotional and financial distress, and reasonable attorney fees to mitigate these damages

WHEREFORE PLAINTIFFS PRAY FOR A JUDGMENT AS SET FORTH:

1. For rescission of the unlawful loans as set

-10-

MOSS & MURPHY
ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

forth herein, including any equitable relief such as issuance of a temporary restraining order and preliminary injunction in order to insure the rescission is achieved as provided by law;

    2.  For general damages according to proof;

    3.  For statutory damages as provided by TILA and HOEPA;

    4.  For attorney fees as provided in TILA and HOEPA;

    5.  For costs of suit; and

    6.  For such other and further relief as the Court finds fair, just and equitable.

DATED: June 5, 2008

                MOSS & MURPHY

By_____
Attorneys for Plaintiffs

Tatranska.Com

-11-

A

Loan Number: 07051063

--------------------------------- CLOSING INSTRUCTIONS ---------------------------------

Reference:

From: FIRST AMERICAN TITLE                    Borrower: GABRIELA TATRANSKA,
                                                        DRAHOTIN TATRANSKA

To: Landmarc Capital & Investment Company     Owners of Record: GABRIELA TATRANSKA,
    4110 North Scottsdale Road, Suite 330                       DRAHOTIN TATRANSKA
    Scottsdale, Arizona 85251

**(A)   SPECIAL CLOSING INSTRUCTIONS:**

a   Don't close this loan until we fax you written authorization!
b   Overnight the closed package to us immediately following closing.
c   Make certain your Purchase Price matches ours (below); do not close if different.
d   Check that you have all the closing docs! Use the checklist (Section P) M Closing Agent is responsible for this.
e   Prior to closing, fax to us: ALTA TITLE POLICY LISTING ALL PROPERTIES ATTACHED.
f   ESCROW OFFICER TO SIGN INSTRUCTION PRIOR TO FUNDING
g   **SEE ATTACHED ADDENDUM TO CLOSING INSTRUCTIONS**

**(B)   TERMS:**

| | | | |
|---|---|---|---|
| Collateral | SEE EXHIBIT "A", , ARIZONA | | |
| Sales Price, if purchase | | Seller-Paid Costs | |
| Loan Amount | 771,000.00 | Document Date | MAY 18, 2007 |
| Loan Type | CONVENTIONAL | Close Date | MAY 18, 2007 |
| Interest Rate | 15.000 | Disburse Date | MAY 21, 2007 |
| Term/Amortization | 12 | First Payment Due | JULY 1, 2007 |
| Lien Position | Second | Occupancy | |
| Earnest Money Deposit | | Purchase/Refi | |
| Prepayment Penalty | | Subord. Financing | 659,243.00 |

**(C)   FEES, CHARGES, CREDITS, IMPOUNDS:**

Show the following Items, Fees, Charges and Impounds on the HUD-1

| HUD # | Fee Description | Borrow-Pd | Seller-Pd | Paid: |
|---|---|---|---|---|
| 801 | Origination Fee $50,000.00 | 50,000.00 | | to: LANDMARC CAPITAL |
| 802 | Discount Fee | | | |
| 803 | Appraisal Fee | | | |
| 808 | Broker Fee | 325.00 | | to: PRIORITY APPRAISAL |
| 811 | Yield Spread Premium (POC $            ) | | | |
| 812 | Commitment Fee | 15.00 | | |
| **900.** | **Pay the following Items in Advance** | | | |
| 901 | O/D Interest ( 321.2500 /day for 11 days) | 3,533.75 | | |
| 903 | Hazard Insurance Premium | | | |
| 906 | Flood Insurance (         months at          /mo) | | | |
| **1000.** | **Deposited these Reserves with Lender** | | | |
| 1001 | Hazard Insurance (      months at        /mo) | | | |
| 1002 | Mortgage Insurance Impound | | | |
| 1003 | City Prop. Tax Impound | | | |
| 1004 | County Prop. Tax Impound | | | |
| 1009 | Aggregate adjustment is | | | |
| **1100.** | **Title Charges** | | | |
| 1101 | Settlement/Closing Fee | | | |
| 1102 | Abstract/Title Search | 600.00 | | to: FIRST AMERICAN TITLE |
| 1103 | Title Examination | | | |
| 1104 | Title Insurance Binder | | | |
| 1105 | Document Preparation | | | |
| 1106 | Notary Fee | 200.00 | | to: FIRST AMERICAN |
| 1107 | Attorney Fee | | | |
| 1108 | Title Insurance | 2,654.00 | | to: FIDELITY AMERICAN TITLE |
| 1111 | Closing Agent Courier Fee | 60.00 | | to: FIRST AMERICAN |
| | COURIER FEE | 50.00 | | to: FIRST AMERICAN TITLE |
| **1300.** | **Additional Settlement Charges** | | | |
| 1301 | Survey | | | |
| 1302 | Pest Inspection | | | |
| 1303 | | | | |
| 1304 | | | | |

**(D)   PAY OFF & VERIFY:**

Verify the following payoffs and show on the HUD-1. *(Closing Agent must verify all payoffs affecting title insurance including mortgages, liens, judgements, etc. Do not rely on our payoff estimates!! It is a condition of the funding of this loan that the following payoffs be made through this closing and shown on HUD-1)*

CLOSING INSTRUCTIONS
08/25/06                          Page 1 of 3          DocMagic eForms 800-649-1362
                                                        www.docmagic.com



FedEx Kinko's.
Office and Print Center

| Fax Cover Sheet

FedEx Kinko's of Walnut Creek, CA        Telephone: 925.934.8254   Fax: 925.934.8277

Date _____        Number of pages _____ (including cover page)

**To:**

Name  LARRY FRATTINI

Company  1ST AMERICAN

Telephone _____

Fax _____

**From:**

Name  STEVEN DAGGETT

Company _____

Telephone  925-382-0414

Comments

PLEASE ADD ANOTHER DEMAND FOR
STEVEN DAGGETT FOR $21,800 FOR
APPRAISALS FINDERS FEES ETC.

More than 1,200 locations worldwide. For the location nearest you, call 1.800.2.KINKOS. Visit our website at fedexkinkos.com.

READ AND APPROVED
BY_____

READ AND APPROVED
BY_____

Dear Mr. Frattini;

This letter is a formal demand regarding the Tatransky escrow you are currently working on. You are hereby instructed to pay Mr. Steven Daggett the sum of $48,405.00 along with a separate check made payable to Mr. Jeff Mariani in the amount of $6,000.00. These fees are due at the closing of your escrow. If you should have any questions please feel free to call me at any time (925) 382-0414.

Steven Daggett

READ AND APPROVED
BY _____

READ AND APPROVED
BY _____

B

Loan Number: 07051063

# BALLOON NOTE
## (FIXED RATE)

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

MAY 18, 2007                    Scottsdale                                ARIZONA
[Date]                              [City]                                [State]

SEE EXHIBIT "A", , ARIZONA
[Property Address]

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 771,000.00            (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Landmarc Capital & Investment Company, An Arizona Corporation

I will make all payments under this Note in the form of cash, check or money order; however, if any check is returned to Lender unpaid, I may be required to make payments by cash, money order or electronic funds transfer.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          15.000   % provided I am not in default of my obligation to make payments when due under this Note.

If I do not make any required payment by the time set forth in Section 6(A) of this Note, I shall pay to Lender interest on unpaid principal at the yearly rate of 30% until I cure such default.

**3.  PAYMENTS**

(A)  Time and Place of Payments

I will make a payment every month. This payment will be for interest only. Therefore, the Principal balance of my loan will not decrease as a result of my monthly payments.

I will make my monthly payments on the 1st    day of each month beginning on JULY 1, 2007 , 2007           . I will make these payments every month until I have paid all of the interest, Principal and any other charges described below that I may owe under this Note. Each payment will be applied in the following order: to interest, to escrow items as required by the Deed of Trust, to other charges and then to Principal.

If, on  JUNE 1, 2008              , which is called the "Maturity Date," I still owe amounts under this Note, I will pay those amounts in full on that date. If I pay all monthly payments exactly when due, the final ("balloon") payment of principal and unpaid interest due on the Maturity Date is estimated to be $ 780,637.50

---

BALLOON NOTE (FIXED RATE) (NON-OWNER OCCUPIED)
01/22/07                                                Page 1 of 4                        DocMagic *eForms* 800-649-1362
                                                                                            www.docmagic.com

I will make payments at    P.O. Box 299, Scottsdale, Arizona 85252

, or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

The amount of my monthly interest payment will be U.S. $ 9,637.50              . If required by the Note Holder, each month I will also pay the "Escrow Items" referred to in the Deed of Trust I sign to secure this Note. Note Holder will notify me of such amounts.

### 4.  PREPAYMENT

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

If I make a full Prepayment or partial Prepayment(s) within        SIX        (  6  ) months of the date of this Note, I will pay a prepayment penalty in an amount equal to fifteen percent (15%) of the amount of the Principal Prepayment I make. If I make a full or partial Prepayment after        SIX        (  6  ) months from the Note date, I may do so without paying any penalty.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, the Prepayment penalty, or other amounts due before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

### 5.  RETURNED CHECK CHARGE

I will pay to the Note Holder a fee if any check is returned to Note Holder. The amount of such returned check charge shall be the greater of $25.00 or the amount permitted by law.

### 6.  LOAN CHARGES AND SEVERABILITY

If a law which applies to this loan and which sets maximum loan charges is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded the permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.  SEVERABILITY

If any provision of this Agreement is held invalid, illegal, void or unenforceable by reason of any rule of law, administrative order or judicial decision, all other provisions of this Agreement shall nevertheless remain in full force and effect.

### 8.  BORROWER'S FAILURE TO PAY AS REQUIRED

(A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of five(5) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the late charge will be fifteen percent (15%) of the amount of the late payment. I will pay this late charge promptly, but only once on each late payment. I also agree to pay interest at the default rate of 30% per year as set forth in Section 2 of this Note.

(B)  Default

If required by the Note Holder, each month I will also pay the "Escrow Items" referred to in the Deed of Trust I sign to secure this Note. Note Holder will notify me of such amounts.

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; (ii) I do not comply with any term or condition of any other document I sign in connection with this Note, including, but not limited to the Deed of Trust or Compliance Agreement; (iii) I made a material misrepresentation on my application for the loan evidenced by this Note or in the documents provided to Lender; or (iv) I die.

---

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least ten (10) days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, court costs and reasonable attorneys' fees and reconveyance fees.

## 9. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 10. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 11. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 12. GOVERNING LAW

This Note is governed by Arizona law to the extent not governed by federal law.

## 13. SECURED NOTE

This Note is secured by a Deed of Trust, dated the same date as this Note, which protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Deed of Trust describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. For instance, if I sell, transfer or assign any right in the Property securing this Note, without Note Holder's prior written consent, the Note Holder may require immediate payment in full of all sums secured by the Deed of Trust. The Deed of Trust provides as follows:

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

BALLOON NOTE (FIXED RATE) (NON-OWNER OCCUPIED)
01/22/07                                          Page 3 of 4                  DocMagic *eFormms* 800-649-1362
www.docmagic.com

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than ten (10) days from the date the notice is given in accordance with this Deed of Trust within which Borrower must pay all sums secured by this Deed of Trust.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)          _____ (Seal)
GABRIELA TATRANSKA          -Borrower           DRAHOTIN TATRANSKA         -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                       -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                       -Borrower


                                                                 [Sign Original Only]

PAY TO THE ORDER OF:
  WITHOUT RECOURSE

Landmarc Capital & Investment Company, An Arizona Corporation

BY: _____

ITS: _____


BALLOON NOTE (FIXED RATE) (NON-OWNER OCCUPIED)
01/22/07                                     Page 4 of 4          DocMagic *eForms* 800-649-1362
                                                                     www.docmagic.com

### Addendum to Balloon Note

This Addendum to Balloon Note ("Addendum") is made this __18th__ day of __May 2007__, and is incorporated into and shall be deemed to amend and supplement that certain Balloon Note (Fixed Rate) (the "Note") made by the undersigned ("Borrower" or "I") in favor of Landmarc Capital & Investment Company ("Lender"), dated the same date as this Addendum. The Note is secured by a Deed of Trust in favor of Lender of even date herewith. Capitalized terms not defined in this Addendum have the same meanings set forth in the Note.

**Additional Covenants**

In addition to the covenants and agreements made in the Note, Borrower further covenants and agrees as follows:

1.      Beginning on the date that my first monthly payment is due, along with each monthly payment on the Note I shall pay to Note Holder the amount of my monthly payment due to __Washington Mutual__("First Mortgage Lender") pursuant to my note to First Mortgage Lender ("First Mortgage Note"), which is secured by a Deed of Trust in favor of First Mortgage Lender. I will make the monthly First Mortgage Note payments to Note Holder every month until the earlier of the date (a) I have paid the First Mortgage Note in full, or (b) I have paid the Note in full.

I understand that I may make a First Mortgage Note payment to Note Holder in the form of cash, check or money order; however, if I make the First Mortgage Note payment by check, Note Holder will hold such check for seven (7) days in order to ensure that the funds are "good" before Note Holder pays to First Mortgage Lender the monthly payment on the First Mortgage Note.

I understand that Note Holder need not accept a partial payment from me. A partial payment is a monthly payment which includes only the monthly payment due to the Note Holder and not the full amount of the payment according to this Addendum, which includes the monthly payment to the First Mortgage Lender.

2.      I will send to Note Holder a copy of all statements and letters I receive from the First Mortgage Lender within five (5) days of my receipt of such statement or letter.

3.      The Note is not modified except as amended by this Addendum. All terms and conditions of the Note not in conflict with this Addendum shall remain in full force and effect.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Addendum.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

......................................................................... (Seal)
                                                                    -Borrower

......................................................................... (Seal)
                                                                    -Borrower

......................................................................... (Seal)
                                                                    -Borrower

*{Sign Original Only}*

# EXHIBIT "A"

**PARCEL 1:**
3233 EAST BROOKWOOD COURT, PHOENIX, AZ 85044
PARCEL #: 306-08-129

LOT 129, OF LAKEWOOD PARCEL 14 AND 15, ACCORDING TO THE
PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF
MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 393 OF MAPS,
PAGE 17.

**PARCEL 2:**
32 EAST DAWN STREET, TEMPE, AZ 85284
PARCEL #:301-61-477

LOT 53, OF WARNER RANCH MANOR, ACCORDING TO THE PLAT OF
RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA
COUNTY, ARIZONA, RECORDED IN BOOK 287 OF MAPS, PAGE 32 AND
CERTIFICATES OF CORRECTION IN DOCUMENT NO. 85-505927 AND
RECORDED IN DOCUMENT NO. 86-228144, BOTH OF OFFICAL
RECORDS.

**PARCEL 3:**
14608 SOUTH 47TH PLACE, PHOENIX, AZ 85044
PARCEL #:307-05-174

LOT 7, OF SILVERADO AT CRIMSON RIDGE, ACCORDING TO THE
PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF
MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 369 OF MAPS,
PAGE 24.

**PARCEL 4:**
11825 NORTH 29TH STREET, PHOENIX, AZ 85028
PARCEL #: 166-29-272

LOT 94, OF IRONWOOD EAST UNIT TWO, ACCORDING TO THE PLAT
OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF
MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 134 OF MAPS,
PAGE 50.

## EXHIBIT "A" – CONT PAGE

**PARCEL 5:**
5621 WEST FRYE STREET, CHANDLER, AZ 85226
PARCEL #:301-88-830

LOT 90, OF CARRINGTON PLACE, ACCORDING TO THE PLAT OF
RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA
COUNTY, ARIZONA, RECORDED IN BOOK 288 OF MAPS, PAGE 27.

**PARCEL 6:**
5225 NORTH 86TH DRIVE, GLENDALE, AZ 85305
PARCEL #:102-11-234

LOT 223, OF CAMELBACK PARK, ACCORDING TO THE PLAT OF
RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA
COUNTY, ARIZONA, RECORDED IN BOOK 313 OF MAPS, PAGE 41 AND
CERTIFICATES OF CORRECTION RECORDED AS 90-286983 AND AS 92-
0490691, BOTH OF OFFICIAL RECORDS.

**PARCEL 7:**
1652 NORTH NEVADA WAY, MESA, AZ 85203
PARCEL #:136-25-287

LOT 223, OF MANCHESTER PARK, ACCORDING TO THE PLAT OF
RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA
COUNTY, ARIZONA, RECORDED IN BOOK 269 OF MAPS, PAGE 42.

**PARCEL 8:**
6021 NORTH 10TH STREET, PHOENIX, AZ 85014
PARCEL #:161-14-149

LOT 3, OF HOMES HOMES, ACCORDING TO THE PLAT OF RECORD IN
THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY,
ARIZONA, RECORDED IN BOOK 191 OF MAPS, PAGE 4.

Loan Number: 07051063

# BALLOON PAYMENT DISCLOSURE

*Notice: Read Before Signing Your Loan Documents*

This loan provides for  11    monthly payments of:  (check one)
[  ] principal and interest   [X  ] interest only
in the amount of $ 9,637.50          each.  Assuming that all of the monthly payments have been paid exactly on the date that each is due, a final balloon payment of the then outstanding principal balance plus all earned interest remaining unpaid estimated to be in the amount of $             780,637.50      shall become due and payable on JUNE 1, 2008                (the "Maturity Date").  This loan is amortized over a    12     month period.

### DO NOT SIGN ANY LOAN DOCUMENTS IF YOU
### HAVE ANY QUESTIONS ABOUT YOUR LOAN PAYMENTS.

Unless otherwise expressly disclosed in the Note, or in an Addendum or a Rider to the Note, **THE LENDER IN THIS TRANSACTION IS UNDER NO OBLIGATION TO REFINANCE THE OUTSTANDING PRINCIPAL BALANCE OF THIS LOAN DUE ON THE MATURITY DATE.**  You may be required to payoff the entire principal balance, plus any unpaid interest due thereon, on the Maturity Date using personal assets.  If this Lender, or any other Lender, agrees to refinance the outstanding balance due on the Maturity Date, you may be required to pay the then prevailing interest rate, which may be higher or lower than the interest rate specified in the Note, plus loan origination costs and fees as are typically incurred when creating a new loan.

I hereby certify that the Borrower(s) have received an oral explanation of the balloon payment provisions of this loan.

ALL BORROWERS MUST SIGN AND DATE

I/We hereby acknowledge receipt of the above notice concerning the balloon payment provisions of this loan. I/We further acknowledge that these provisions have also been orally explained to me/us.

_____
(Signature of Loan Officer)

Loan Number: 07051063

# PREPAYMENT PRIVILEGE ADDENDUM TO NOTE

This "PREPAYMENT PRIVILEGE ADDENDUM TO NOTE" (hereinafter "Addendum") is made this 18th day of MAY, 2007          , and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") of the same date made by the undersigned (the "Borrower") to Landmarc Capital & Investment Company, An Arizona Corporation

(the "Lender") which is secured by a Deed of Trust or Mortgage ("Security Instrument") on real property located at:

SEE EXHIBIT "A", , ARIZONA
[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree that the paragraph entitled either "Borrower's Right To Prepay" or "Borrower's Payments Before They Are Due" whichever is applicable, found in the Note to which this Addendum is attached, is amended to include the following:

1.  Maker may prepay the Note in Whole or in part at any time during the term of the Note. In the event maker prepays any portion of the outstanding principal balance of the Note during the first     6          months of the Note, maker shall pay in addition to such prepayment (or as a deduction therefrom) a penalty in an amount equal to (15%) fifteen percent of the principal amount so paid.

2.  Holder shall apply any prepayment first to reduce any interest and charges, including the prepayment penalty, owing at the time of such prepayment, and then reduce the amount of the principal allowed under the Note, provided that such balance shall be applied to the principal in reverse order of the due date of each payment and shall not otherwise affect or delay the due date of the next payment provided under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants in this Prepayment Privilege Addendum To Note.

(Seal)

_____ (Seal)

C

LIST OF HOMES PLEDGED AS SECURITY FOR THE LOAN

1.  3233 East Brookwood Court
    Phoenix, Arizona 85044

2.  6021 North 10th Street
    Phoenix, Arizona 85014

3.  11825 North 29th Street
    Phoenix, Arizona 85028

4.  14608 South 49th Place
    Phoenix, Arizona 85044

5.  5225 North 86th Drive
    Glendale, Arizona 85303

6.  5621 Frye Street
    Chandler, Arizona 85226

7.  1652 North Nevada Way
    Mesa, Arizona 85203

8.  32 East Dawn Street
    Tempe, Arizona 85284

In addition, there is a Cross Default provision in
paragraph I on page two of the "1-4 Family Rider" which
is attached to the Deed of Trust.  This provision was not
called to the attention of plaintiffs by any of the
defendants.  Neither did any of defendants identify which
real estate they believed was included in the provision.
However, defendants were required to identify the
following additional homes in their paperwork which
plaintiffs may have signed.  Plaintiffs are uncertain if
defendants believe they have a security interest in the
following homes:

9.  783 Horton Court        Principal residence of
    Hayward, CA 94544       plaintiffs

10. 1391 Reiger Ave.        New principal residence
    Hayward, Ca 94544       of plaintiffs, being
                            finished with the money
                            provided in the loan
                            described in this suit

ATTORNEYS AT LAW
1297 B STREET
HAYWARD, CALIFORNIA 94541
(510) 583-1155

After Recording Return To:
Landmarc Capital & Investment Company
4110 North Scottsdale Road, Suite 330
Scottsdale, Arizona 85251

Loan Number: 07051063

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## (Securing Balloon Note)

This Deed of Trust is made this 18th day of MAY, 2007                          among the Trustor,
GABRIELA TATRANSKA, A SINGLE WOMAN AND DRAHOTIN TATRANSKA, A
SINGLE MAN AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP

                                                                        ("Borrower")
having the mailing address of 783 HORTON COURT, HAYWARD, CALIFORNIA 94544
Fidelity National Title Insurance Company                                    ;
the Trustee ("Trustee") having the mailing address of   11022 North 28th Drive, Suite
155, Phoenix, Arizona 85029                                                  ;
and the beneficiary, Landmarc Capital & Investment Company
                                                              , ("Lender")
a An Arizona Corporation         , having the mailing address of 4110 North Scottsdale
Road, Suite 330, Scottsdale, Arizona 85251

## TRANSFER OF RIGHTS IN THE PROPERTY
For and in consideration of that certain loan from Lender to Borrower evidenced by a balloon note of even date
herewith in the original principal amount of SEVEN HUNDRED SEVENTY-ONE THOUSAND AND
00/100                    ($ 771,000.00)   dollars having a balloon payment due on the maturity date of
JUNE 1, 2008                    (as amended "Note"), and in order to secure the repayment of(a) the debt
evidenced by the Note and all renewals, extensions and modifications of the Note; (b) all sums secured by this Deed
of Trust (collectively, "Loan").; and (c) the performance of Borrower's covenants and agreements under this Deed
of Trust and the Note. Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the
following described property located in the
                            COUNTY of              MARICOPA                    :
             [Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]
SEE ATTACHED EXHIBIT "A"
A.P.N.: SEE EXHIBIT A

which currently has the address of SEE EXHIBIT "A"

[Street]

("Property Address"):

[City]                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property and all replacements and additions ("Property").

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record. Borrower represents and warrants that Borrower does not reside at the Property.

Borrower and Lender covenant and agree as follows:
1. **Payment and Performance.** Borrower shall pay when due all amounts required by the Note, this Deed of Trust and all other documents executed by Borrower in connection with the Loan. Borrower shall perform all duties and do all things required by the Note, this Deed of Trust and all other documents executed by Borrower in connection with the Loan.

Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each periodic payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender may apply such funds. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Deed of Trust or performing the covenants and agreements secured by this Deed of Trust.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order: (a) interest; (b) amounts due under this Deed of Trust; (c) other charges; (d) principal.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date or change the amount of the periodic payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day monthly payments are due under the Note a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Deed of Trust as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender; and (d) dues, fees or assessments imposed by a homeowners or condominium association or similar organization. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives in writing Borrower's obligation to pay the Funds for any or all Escrow Items. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Lender may revoke the waiver as to any or all Escrow Items at any time by written notice, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified by law, and (b) in the amounts required by law. Lender is not required to pay Borrower any interest or earnings on the Funds but will account to Borrower for the Funds as required by law. If there is a deficiency of Funds held in escrow, Lender shall notify Borrower as required by law. Borrower shall pay to Lender the amount necessary to make up the deficiency as permitted by law.

Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Deed of Trust, leasehold payments or ground rents on the Property, if any, and dues, fees or assessments imposed by a homeowners or condominium association or similar organization. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Deed of Trust unless Lender waives such requirement in writing in Lender's sole discretion upon such terms as determined by Lender.

Lender may require Borrower to pay charges for a real estate tax verification, title examination or other reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance, in the amounts (including deductible levels),form (including loss payee clause) and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan charges for flood zone determination, certification and tracking. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section shall become additional debt of Borrower secured by this Deed of Trust. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If Lender requires, Borrower shall promptly give to Lender evidence of insurance, receipts of paid premiums and renewal notices.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or applicable law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Deed of Trust, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, to the extent of Lender's interest in the insurance proceeds, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Deed of Trust, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property,

DEED OF TRUST (SECURING BALLOON NOTE)
04/20/06                                    Page 3 of 9                    DocMagic *eForms* 800-649-1362
www.docmagic.com

insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Deed of Trust, whether or not then due.

     6.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to this Deed of Trust that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

     Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property upon reasonable notice to Borrower.

     7.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities gave false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

     8.  **Protection of Lender's Interest in the Property and Rights Under this Deed of Trust.** If (a) Borrower fails to perform the covenants and agreements contained in this Deed of Trust, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Deed of Trust (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Deed of Trust or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Deed of Trust, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Deed of Trust; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Deed of Trust, including its secured position in a bankruptcy proceeding. Although Lender may take action under this Section, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section.

     Any amounts disbursed by Lender under this Section shall become additional debt of Borrower secured by this Deed of Trust. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

     If this Deed of Trust is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

     9.  **Assignment of Miscellaneous Proceeds; Forfeiture.** If any compensation or proceeds are paid by any third party (other than hazard insurance proceeds) for (a) damage to or destruction of all or part of the Property; (b) condemnation or taking of all or part of the Property; or (c) conveyance in lieu of condemnation ("Miscellaneous Proceeds"), such Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender subject to any first priority deed of trust which has priority over this Deed of Trust.

     If the Property is damaged, the Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Deed of Trust, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in this Deed of Trust.

---

DEED OF TRUST (SECURING BALLOON NOTE)
04/20/06                     Page 4 of 9               DocMagic *eForms* 800-649-1362
www.docmagic.com

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Deed of Trust, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Deed of Trust immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Deed of Trust shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Deed of Trust whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Deed of Trust, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Deed of Trust. Borrower may cure such a default and, if acceleration has occurred, reinstate as provided in this Deed of Trust, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Deed of Trust. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender subject to the interest of the holder of any first priority deed of trust which has priority over this Deed of Trust.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

10. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Deed of Trust granted by Lender shall not operate to release the liability of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or successors in interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

11. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Deed of Trust but does not execute the Note (a "co-signer"): (a) is co-signing this Deed of Trust only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Deed of Trust; (b) is not personally obligated to pay the sums secured by this Deed of Trust; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Deed of Trust or the Note without the co-signer's consent.

Any successor in interest of Borrower who assumes Borrower's obligations under this Deed of Trust in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Deed of Trust. Borrower shall not be released from Borrower's obligations and liability under this Deed of Trust unless Lender agrees to such release in writing. The covenants and agreements of this Deed of Trust shall bind and benefit the successors and assigns of Lender.

12. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Deed of Trust, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence

DEED OF TRUST (SECURING BALLOON NOTE)
04/20/06                                    Page 5 of 9                                    DocMagic *eFerms* 800-649-1362
www.docmagic.com

of express authority in this Deed of Trust to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Deed of Trust or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be applied to the Loan and any excess shall be refunded to Borrower.

13.  **Notices.**  All notices given by Borrower or Lender in connection with this Deed of Trust must be in writing.  Any notice to Borrower in connection with this Deed of Trust shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless applicable law expressly requires otherwise.  The notice address shall be the Property address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  There may be only one designated notice address under this Deed of Trust at any one time unless applicable law requires otherwise.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.. Any notice in connection with this Deed of Trust shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Deed of Trust is also required by law, the requirement of such law will satisfy the corresponding requirement under this Deed of Trust.

14.  **Governing Law; Severability; Rules of Construction.**  This Deed of Trust shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Deed of Trust are subject to any requirements and limitations of applicable law.  Applicable law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision.

15.  **Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Deed of Trust.  However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than  ten (10) days from the date the notice is given in accordance with this Deed of Trust within which Borrower must pay all sums secured by this Deed of Trust.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

16.  **Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Deed of Trust discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Deed of Trust; (b) such other period as applicable law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Deed of Trust.  Those conditions are that Borrower:  (a) pays Lender all sums which then would be due under this Deed of Trust and the Note as if no acceleration had occurred;  (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Deed of Trust, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Deed of Trust; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Deed of Trust, and Borrower's obligation to pay the sums secured by this Deed of Trust, shall continue unchanged.  Lender may require that Borrower pay such

DEED OF TRUST (SECURING BALLOON NOTE)
04/20/06                                Page 6 of 9                    DocMagic *eFarms* 800-649-1362
                                                                          www.docmagic.com

reinstatement sums and expenses in the following form selected by Lender, including, but not limited to: (a) cash (b) money order or (c) electronic funds transfer. Upon reinstatement by Borrower, this Deed of Trust and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under this Section.

    **17. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Deed of Trust) can be sold one or more times without prior notice to Borrower. If there is a change of the loan servicer, Borrower will be given written notice of the change as required by law.

    **18. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Deed of Trust (but not prior to acceleration under Section 15 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than ten (10) days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Deed of Trust and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Deed of Trust without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

    If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by applicable law to Borrower and to the other persons prescribed by applicable law. After the time required by applicable law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

    Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be *prima facie* evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Deed of Trust; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

    **19. Release.** Upon payment of all sums secured by this Deed of Trust, Lender shall release this Deed of Trust. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Deed of Trust, if permitted under applicable law.

    **20. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

    **21. Time of Essence.** Time is of the essence in each covenant of this Deed of Trust.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Deed of Trust and in any rider executed by Borrower and recorded with it.

Witnesses:

_____          _____


_____ (Seal)    _____ (Seal)
GABRIELA TATRANSKA          -Borrower      DRAHOTIN TATRANSKA          -Borrower


_____ (Seal)    _____ (Seal)
                            -Borrower                                 -Borrower


_____ (Seal)    _____ (Seal)
                            -Borrower                                 -Borrower

Loan Number: 07051063

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this  18th day of  MAY, 2007                     ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to   Landmarc Capital & Investment Company, An
Arizona Corporation
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

SEE EXHIBIT "A", , ARIZONA

[Property Address]

1-4 FAMILY COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A.  ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.  In addition
to the Property described in the Security Instrument, the following items are added to the Property
description, and shall also constitute the Property covered by the Security Instrument: building materials,
appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be
used in connection with the Property, including, but not limited to, those for the purposes of supplying or
distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing
apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks,
ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors,
screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor
coverings now or hereafter attached to the Property, all of which, including replacements and additions
thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument.  All of
the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the
Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument
as the "Property."

B.  USE OF PROPERTY; COMPLIANCE WITH LAW.  Borrower shall not seek, agree to or
make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to
the change.  Borrower shall comply with all laws, ordinances, regulations and requirements of any
governmental body applicable to the Property.

C.  SUBORDINATE LIENS.  Except as permitted by federal law, Borrower shall not allow any lien
inferior to the Security Instrument to be perfected against the Property without Lender's prior written
permission.

D.  RENT LOSS INSURANCE.  Borrower shall maintain insurance against rent loss in addition to
the other hazards for which insurance is required by Uniform Covenant 5.

E.  "BORROWER'S RIGHT TO REINSTATE" DELETED.  Uniform Covenant 18 is deleted.

F.  BORROWER'S OCCUPANCY.  Unless Lender and Borrower otherwise agree in writing, the
first sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted.  All
remaining covenants and agreements set forth in Uniform Covenant 6 shall remain in effect.

G.  ASSIGNMENT OF LEASES.  Upon Lender's request, Borrower shall assign to Lender all leases
of the Property and all security deposits made in connection with leases of the Property.  Upon the

assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION. Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to paragraph 21 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Uniform Covenant 7.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
GABRIELA TATRANSKA          -Borrower

_____ (Seal)
DRAHOTIN TATRANSKA          -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

MULTISTATE 1-4 FAMILY RIDER - Single Family
FNMA/FHLMC UNIFORM INSTRUMENT
Form 3170  9/90                    Page 3 of 3

DocMagic *Formms* 800-649-1362
www.docmagic.com